STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MATTHEW O'BRIEN (Cal. Bar No. 261568)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Environmental and Community Safety Crimes Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-8644/3819
     Facsimile: (213) 894-0141
     E-mail:   Matthew.O'Brien@usdoj.gov
               Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 21-226-DOC |
|     Plaintiff, | <u>PLEA AGREEMENT FOR DEFENDANT BETA OPERATING COMPANY, LLC</u> |
|        v. | |
| AMPLIFY ENERGY CORP.,<br>BETA OPERATING COMPANY, LLC,<br>  d/b/a "Beta Offshore," and<br>SAN PEDRO BAY PIPELINE COMPANY, | |
|     Defendants. | |

    1.   This constitutes the binding plea agreement between defendant BETA OPERATING COMPANY, LLC, doing business as "Beta Offshore" ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

//

1

<u>RULE 11(c)(1)(C) AGREEMENT</u>

2      2.   Defendant understands that this agreement is entered into

3  pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).

4  Accordingly, defendant understands that, if the Court determines that

5  it will not accept this agreement, absent a breach of this agreement

6  by defendant prior to that determination and whether or not defendant

7  elects to withdraw any guilty plea entered pursuant to this

8  agreement, this agreement will, with the exception of paragraph 20

9  below, be rendered null and void and both defendant and the USAO will

10  be relieved of their obligations under this agreement.  Defendant

11  agrees, however, that if defendant breaches this agreement prior to

12  the Court's determination whether or not to accept this agreement,

13  the breach provisions of this agreement, paragraphs 22 and 23 below,

14  will control, with the result that defendant will not be able to

15  withdraw any guilty plea entered pursuant to this agreement, the USAO

16  will be relieved of all of its obligations under this agreement, and

17  the Court's failure to follow any recommendation or request regarding

18  sentence set forth in this agreement will not provide a basis for

19  defendant to withdraw defendant's guilty plea.

20

<u>DEFENDANT'S OBLIGATIONS</u>

21      3.   Defendant agrees to:

22           a.   At the earliest opportunity requested by the USAO and

23  provided by the Court, appear and plead guilty to the single-count

24  indictment in <u>United States v. AMPLIFY ENERGY CORP. et al.</u>, CR No.

25  21-226-DOC, which charges defendant with negligent discharge of oil

26  into the contiguous zone of the United States, in violation of 33

27  U.S.C. §§ 1321(b)(3), 1319(c)(1)(A).

28           b.   Not contest facts agreed to in this agreement.

2

1    c.   Abide by all agreements regarding sentencing contained
2    in this agreement and affirmatively recommend to the Court that it
3    impose sentence in accordance with paragraph 15 of this agreement.

4    d.   Appear for all court appearances, and obey any other
5    ongoing court order in this matter.

6    e.   Not commit any crime; however, offenses that would be
7    excluded for sentencing purposes under United States Sentencing
8    Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not
9    within the scope of this agreement.

10   f.   Be truthful at all times with the United States
11   Probation and Pretrial Services Office and the Court.

12   g.   Pay the applicable special assessment at or before the
13   time of sentencing unless defendant has demonstrated a lack of
14   ability to pay such assessments.

15   h.   Be jointly and severally liable for the criminal fine
16   that the Court imposes on co-defendant AMPLIFY ENERGY CORP.

17   i.   Agree to, and not oppose the imposition of, the
18   conditions of probation set forth in Exhibit 1, attached hereto and
19   incorporated herein by reference.

20                        THE USAO'S OBLIGATIONS
21   4.   The USAO agrees to:

22   a.   Not contest facts agreed to in this agreement.

23   b.   Abide by all agreements regarding sentencing contained
24   in this agreement and affirmatively recommend to the Court that it
25   impose a sentence in accordance with paragraph 15 of this agreement.

26   c.   Except for criminal tax violations (including
27   conspiracy to commit such violations chargeable under 18 U.S.C.
28   § 371), not further criminally prosecute defendant for violations

                                  3

arising out of defendant's conduct described in the agreed-to factual basis attached to this agreement as Exhibit 2. Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement. Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

COMPANY AUTHORIZATION

5. Defendant represents that it is authorized to enter into this agreement. On or before the change of plea hearing pursuant to this agreement, defendant shall provide the USAO and the Court with a notarized legal document certifying that defendant is authorized to enter into and comply with all of the provisions of this agreement. Such resolution shall designate the company representative who is authorized to take the actions specified in this agreement, including pleading guilty on behalf of the company, and shall also state that all legal formalities for such authorizations have been observed.

ORGANIZATIONAL CHANGES AND APPLICABILITY

6. This agreement shall bind defendant, its successor corporation(s), if any, and any other person or entity that assumes the liabilities contained herein ("successor-in-interest"). No change in name, change in corporate or individual control, business reorganization, change in ownership, merger, change of legal status, sale or purchase of assets, or similar action shall alter defendant's responsibilities under this agreement. Defendant shall not engage in

any action to seek to avoid the obligations and conditions set forth in this agreement.

RESPONDEAT SUPERIOR

7.    The parties stipulate and agree that under principles of corporate liability and respondeat superior, as these principles apply in this case, defendant is liable for the actions of its agents and employees.  New York Central and Hudson River R.R. v. United States, 212 U.S. 481, 495 (1909); United States v. Beusch, 596 F.2d 871, 877-878 (9th Cir. 1979); United States v. Hilton Hotels Corporation, 467 F.2d 1000, 1004-1007 (9th Cir. 1972).

NATURE OF THE OFFENSE

8.    Defendant understands that for defendant to be guilty of the crime charged in the indictment, that is, negligent discharge of oil into the contiguous zone of the United States, in violation of Title 33, United States Code, Sections 1321(b)(3), 1319(c)(1)(A), the following must be true: (1) a person; (2) discharged oil; (3) into waters of the United States . . . or into the contiguous zone; (4) in a quantity that may be harmful; and (5) acted negligently.

PENALTIES AND RESTITUTION

9.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 33, United States Code, Sections 1321(b)(3), 1319(c)(1)(A), is: 5 years of probation; a fine of $25,000 per day of violation, or $200,000 per offense, or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $125.

10.    Regarding restitution, the parties agree as follows:

a.    Pursuant to 18 U.S.C. § 3663, the Court may order that defendant make restitution to any victims of the offense to which defendant is pleading guilty.

b.    Many of the victims of defendant's offense will be able to pursue reimbursement for their alleged losses through (1) the ongoing civil action captioned <u>Peter Moses Gutierrez et al. v. Amplify Energy Corporation et al.</u> (C.D. Cal. Case No. 8:21-CV-01628-DOC); and (2) the claims process under the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 <u>et seq.</u> (the "OPA Process").

c.    As part of defendant's probationary terms, defendant is agreeing to make whole governmental agencies and entities that have incurred direct and indirect expenses as the result of their response in the aftermath of defendant's offense, where such expenses have not yet been reimbursed by defendant, including the U.S. Coast Guard and the Oil Spill Liability Trust Fund.

d.    Here, the large number of potential victims of defendant's offense and the potential complexity of those victims' claims justify the Court's invocation of 18 U.S.C. § 3663(a)(1)(B)(ii) in order to decline to issue an order of restitution in this matter.  In addition, the OPA Process, the federal civil case, and the probation terms of this case provide alternative means for victims of defendant's offense to be made whole.

<u>SUSPENSION/REVOCATION/DEBARMENT</u>

11.  Defendant understands that if defendant holds any regulatory license or permit, the conviction in this case may result in the suspension or revocation of such license and/or permit.  By this agreement, the USAO makes no representation or promise

6

concerning suspension or debarment of defendant from contracting with the United States or with any office, agency, or department thereof. Suspension and debarment of organizations convicted under various federal regulatory protection and criminal statutes is a discretionary administrative action solely within the authority of the federal contracting agencies.

12.   Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

FACTUAL BASIS

13.   Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts attached hereto as Exhibit 2, and incorporated herein by reference, and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

SENTENCING FACTORS AND AGREED-UPON SENTENCE

14.   Defendant and the USAO agree and stipulate that, pursuant to United States Sentencing Guidelines ("U.S.S.G.") §§ 8C2.1 and 8C2.10, the sentencing guidelines are not applicable in determining the fine for an organization violating 33 U.S.C. §§ 1321(b)(3), 1319(c)(1)(A), but all other sections of Chapter 8 of the U.S.S.G. are applicable in this case, including the provisions regarding probation.  Defendant understands that in determining defendant's sentence, the Court is also required to consider the factors set forth in Title 18, United States Code, Sections 3553(a) and 3572,

including the kinds of sentences and sentencing ranges established under the Sentencing Guidelines.

15. Pursuant to Chapter 8 of the Sentencing Guidelines and the factors set forth in Title 18, United States Code, Sections 3553(a) and 3572, including the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant, the parties agree to advocate and affirmatively recommend that the Court sentence defendant as follows:

a. <u>Probation</u>: Defendant should be sentenced to probation for a term of four years with conditions to be fixed by the Court. The probationary terms shall include those terms set forth in Exhibit 1 to this agreement, which is incorporated herein by reference.

b. <u>Criminal Fine</u>: Defendant shall be jointly and severally liable for the criminal fine that the Court imposes on co-defendant AMPLIFY ENERGY CORP.

c. <u>Special Assessment</u>: Defendant shall pay a total special assessment of $125.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

16. Defendant understands that by pleading guilty, defendant gives up the following rights:

a. The right to persist in a plea of not guilty.

b. The right to a speedy and public trial by jury.

8

c.   The right to be represented by counsel at trial. Defendant understands, however, that, defendant retains the right to be represented by counsel at every other stage of the proceeding.

d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.   The right to confront and cross-examine witnesses against defendant.

f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.   Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

## WAIVER OF APPEAL OF CONVICTION

17.   Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

## LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

18.   Defendant agrees that, provided the Court imposes the sentence specified in paragraph 15 above, defendant gives up the right to appeal any portion of that sentence, and the procedures and

9

calculations used to determine and impose any portion of that sentence.

19. The USAO agrees that, provided the Court imposes the sentence specified in paragraph 15 above, the USAO gives up its right to appeal any portion of that sentence, and the procedures and calculations used to determine and impose any portion of that sentence.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

20. Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge or any civil, administrative, or regulatory action that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<u>EFFECTIVE DATE OF AGREEMENT</u>

21. This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

<u>BREACH OF AGREEMENT</u>

22.   Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea, (b) the USAO will be relieved of all its obligations under this agreement, and (c) the Court's failure to follow any recommendation or request regarding sentence set forth in this agreement will not provide a basis for defendant to withdraw defendant's guilty plea.

23.   Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge or any civil, administrative, or regulatory action that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the

11

1   extent that such defenses existed as of the date of defendant's
2   signing this agreement.

3          c.   Defendant agrees that: (i) any statements made by
4   defendant, under oath, at the guilty plea hearing (if such a hearing
5   occurred prior to the breach); (ii) the agreed to factual basis
6   statement in this agreement; and (iii) any evidence derived from such
7   statements, shall be admissible against defendant in any such action
8   against defendant, and defendant waives and gives up any claim under
9   the United States Constitution, any statute, Rule 410 of the Federal
10  Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal
11  Procedure, or any other federal rule, that the statements or any
12  evidence derived from the statements should be suppressed or are
13  inadmissible.

14      <u>COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES</u>
15                    <u>OFFICE NOT PARTIES</u>

16      24.  Defendant understands that the Court and the United States
17  Probation and Pretrial Services Office are not parties to this
18  agreement and need not accept any of the USAO's sentencing
19  recommendations or the parties' agreements to facts, sentencing
20  factors, or sentencing.  Defendant understands that the Court will
21  determine the facts, sentencing factors, and other considerations
22  relevant to sentencing and will decide for itself whether to accept
23  and agree to be bound by this agreement.

24      25.  Defendant understands that both defendant and the USAO are
25  free to: (a) supplement the facts by supplying relevant information
26  to the United States Probation and Pretrial Services Office and the
27  Court, (b) correct any and all factual misstatements relating to the
28  Court's Sentencing Guidelines calculations and determination of

                                  12

sentence, and (c) argue on appeal and collateral review that the
Court's Sentencing Guidelines calculations and the sentence it
chooses to impose are not error, although each party agrees to
maintain its view that the sentence referenced in paragraph 15 is
consistent with the facts of this case.  While this paragraph permits
both the USAO and defendant to submit full and complete factual
information to the United States Probation and Pretrial Services
Office and the Court, even if that factual information may be viewed
as inconsistent with the facts agreed to in this agreement, this
paragraph does not affect defendant's and the USAO's obligations not
to contest the facts agreed to in this agreement.

<u>NO ADDITIONAL AGREEMENTS</u>

26.  Defendant understands that, except as set forth herein,
there are no promises, understandings, or agreements between the USAO
and defendant or defendant's attorney, and that no additional
promise, understanding, or agreement may be entered into unless in a
writing signed by all parties or on the record in court.

//

//

//

1    PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2         27.  The parties agree that this agreement will be considered

3    part of the record of defendant's guilty plea hearing as if the

4    entire agreement had been read into the record of the proceeding.

5    AGREED AND ACCEPTED

6    UNITED STATES ATTORNEY'S OFFICE
     FOR THE CENTRAL DISTRICT OF
7    CALIFORNIA

8    STEPHANIE S. CHRISTENSEN
     Acting United States Attorney

9

10   _____          August 26, 2022
     MATTHEW O'BRIEN                        _____
11   BRIAN FAERSTEIN                        Date
     Assistant United States Attorneys

12

13

14   _____          _____
                                            Date
15   Authorized Representative of
     Defendant BETA OPERATING COMPANY,
16   LLC

17

18   _____          August 26, 2022
                                            _____
19   BRIAN A. BENCZKOWSKI                   Date
     MARK C. HOLSCHER
20   Kirkland & Ellis LLP
     Attorneys for Defendant BETA
21   OPERATING COMPANY, LLC

22

23                  CERTIFICATION OF DEFENDANT

24        I have read this agreement in its entirety.  I have had enough

25   time to review and consider this agreement, and I have carefully and

26   thoroughly discussed every part of it with defendant's attorney.  I

27   understand the terms of this agreement, and I voluntarily agree to

28   those terms.  I have discussed the evidence with defendant's

                                   14

1    PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2    27.  The parties agree that this agreement will be considered

3    part of the record of defendant's guilty plea hearing as if the

4    entire agreement had been read into the record of the proceeding.

5    AGREED AND ACCEPTED

6    UNITED STATES ATTORNEY'S OFFICE
     FOR THE CENTRAL DISTRICT OF
7    CALIFORNIA

8    STEPHANIE S. CHRISTENSEN
     Acting United States Attorney

9

10   _____          _____
11   MATTHEW O'BRIEN                      Date
     BRIAN FAERSTEIN
12   Assistant United States Attorneys

13

14   _____*Mat Will*_____          ___*8/26/2022*_____
15   Authorized Representative of          Date
     Defendant BETA OPERATING COMPANY,
16   LLC

17

18

19   _____          _____
     BRIAN A. BENCZKOWSKI                  Date
20   MARK C. HOLSCHER
     Kirkland & Ellis LLP
21   Attorneys for Defendant BETA
     OPERATING COMPANY, LLC

22

23                    CERTIFICATION OF DEFENDANT

24    I have read this agreement in its entirety.  I have had enough

25   time to review and consider this agreement, and I have carefully and

26   thoroughly discussed every part of it with defendant's attorney.  I

27   understand the terms of this agreement, and I voluntarily agree to

28   those terms.  I have discussed the evidence with defendant's

                                   14

attorney, and defendant's attorney has advised me of defendant's rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  No promises, inducements, or representations of any kind have been made to me or defendant other than those contained in this agreement.  No one has threatened or forced me or defendant in any way to enter into this agreement.  I am satisfied with the representation of defendant's attorney in this matter, and defendant is pleading guilty because defendant is guilty of the charge and wishes to take advantage of the promises set forth in this agreement, and not for any other reason.

_____     8/26/2022
                                  Date
Authorized Representative of
Defendant BETA OPERATING COMPANY,
LLC


## CERTIFICATION OF DEFENDANT'S ATTORNEY

I am defendant's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client.  Further, I have fully advised my client of its rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this

15

1   agreement; no one has threatened or forced my client in any way to

2   enter into this agreement; my client's decision to enter into this

3   agreement is an informed and voluntary one; and the factual basis set

4   forth in this agreement is sufficient to support my client's entry of

5   a guilty plea pursuant to this agreement.

6   _____        August 26, 2022

7   BRIAN A. BENCZKOWSKI                      Date
    MARK C. HOLSCHER
8   Kirkland & Ellis LLP
    Attorneys for Defendant BETA
9   OPERATING COMPANY, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 1**

Additional Terms of Probation

The following terms of probation shall apply to defendants AMPLIFY ENERGY CORP., BETA OPERATING COMPANY, LLC, doing business as "Beta Offshore," and SAN PEDRO BAY PIPELINE COMPANY (collectively, "defendants"), in addition to the standard conditions of probation, as applicable, to be set by the Court pursuant to the Second Amended General Order No. 20-04.

1.     Defendants shall make whole governmental agencies and entities, including the United States Coast Guard and the Oil Spill Liability Trust Fund administered by the Coast Guard, for direct and indirect expenses incurred as the result of the governmental response in the aftermath of the spill from the 17-mile San Pedro Bay Pipeline (the "Pipeline"), in accordance with submissions for payment received by those agencies and where such expenses have not yet been reimbursed by defendants at the time of entry of defendants' guilty pleas.  To date, the Coast Guard has incurred approximately $5,844,700 in direct and indirect expenses in responding to the spill, including funds expended out of the Oil Spill Liability Trust Fund.  Defendants have begun to make repayment toward those expenses.

2.     Within 60 days of defendants' entry of their guilty pleas, defendants shall ensure all operational employees and related management personnel are trained and instructed, in compliance with California Government Code Section 8670.25.5, to immediately notify and update all appropriate response agencies, including the California State Office of Emergency Services ("Cal-OES"), and any local unified environmental program or agency, of any release or threatened release of a hazardous material or pollutant substance

from any pipeline, conveyance system, or any other operation of defendants in the State of California, as required by law.

3.   At the time they are authorized to restart production through the Pipeline, defendants shall ensure they are using a leak detection system on the Pipeline that provides the Best Achievable Protection using the Best Achievable Technology, as those terms are defined in Title 14 of the California Code of Regulations, Section 790, subdivision (b)(5), and Section 790, subdivision (b)(6).  The new leak detection system will run concurrently with the previous leak detection system for up to 180 days after production is authorized to restart to ensure that the new leak detection system is appropriately calibrated to the Pipeline.

4.   The operator of the Pipeline shall report any indication of lateral or elevation movement as identified by the GPS tracking from remotely operated vehicle ("ROV") visual inspections and report any indication of damages identified from the visual inspections, such as the concrete casing being damaged or displaced.  Data indicating deviation from the permitted location of the Pipeline shall be provided to the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA"), the State Lands Commission, and the State Fire Marshal within seven (7) days after the ROV videos are processed and provided to defendants.

5.   After each leak detection alarm, defendants shall notify the Cal-OES State Warning Center of the leak detection alarm.

6.   Defendants shall establish and maintain a contract with an oil spill response organization, vessel service company, or other entity that will promptly deploy upon request, and that has the

capability to detect oil on the surface of the water at night or in low-light conditions.

7.   Defendants must conduct actual visual inspections of the Pipeline semiannually (*e.g.,* an ROV).  Driving a boat on the surface of the water over the route of the Pipeline is not sufficient. Anomalies found on the Pipeline shall be reported to PHMSA, the United States Department of Interior Bureau of Safety and Environmental Enforcement ("BSEE"), and the California State Fire Marshal.

8.   Defendants shall revise the Risk & Hazard Analysis in their oil spill contingency plan that has been approved by the California Department of Fish and Wildlife, Office of Spill Prevention and Response ("OSPR") [Plan # M5-24-3231] to expressly account for the risk to pipelines from anchors, vessels, or fishing operations.

9.   Defendants shall resubmit its oil spill contingency plan to OSPR [Plan # M5-24-3231], with updates reflecting the changes required by these probationary terms, and notify the United States Probation and Pretrial Services Office ("Probation") and the Chief of the Environmental and Community Safety Crimes Section ("ECSCS") at the United States Attorney's Office for the Central District of California ("USAO") that they have done so.

10.   Defendants shall review and ensure adequacy of the existing O & M Manual and sections related to Leak Detection (Section 5.02), Abnormal Operating Conditions (PSOM section 17.08), and Emergency Response Procedures (PSOM Section 17.09).  Once the review and changes are completed, defendants shall submit updated documents to OSPR and notify Probation and the Chief of ECSCS at the USAO that they have done so.

3

11.   Defendants shall review and update the SPBPL 16" Manual
Leak Detection Procedure (SPBPL-001.00 rev: REA 7/11) to reflect
current practices and compliance with probation terms.  Once the
review and updates are completed, defendants shall submit updated
documents to OSPR and notify Probation and the Chief of ECSCS at the
USAO that they have done so.

12.   Defendants shall review and update all of the spill
notification procedures found in their plan submitted to OSPR [Plan
# M5-24-3231] to ensure compliance with requirements for immediate
notification pursuant to California Government Code Section
8670.25.5.  Once completed, defendants shall submit the updated
procedures to OSPR and notify Probation and the Chief of ECSCS at the
USAO that they have done so.

13.   Defendants shall provide training to operational employees
and related management personnel on all requirements and updated
spill notification procedures for immediate notification, in
compliance with California Government Code Section 8670.25.5, to
appropriate federal, state and local authorities, including the
United States Coast Guard National Response Center and the Cal-OES
State Warning Center.

14.   Defendants shall make modifications to their existing
pipeline related procedures.  These modifications will require
financial investment of at least $250,000 and defendants will use
best efforts to implement any procedural improvements that their
third-party consultant Eagle Energy Services LLC concludes to be
necessary before the Pipeline is restarted with the pumping of oil,
to the extent such proposed procedural improvements are not in

conflict with any requirements from PHMSA and BSEE, the agencies responsible for approving the restart of operations on the Pipeline.

15.   Defendants shall provide mandatory training to operational employees and related management personnel on these updated operational policies and procedures, and engage a qualified third-party provider to provide updated training on shipping, shut-down, and restart before restarting Pipeline operations.

**Exhibit 2**

Statement of Facts in Support of BETA OPERATING COMPANY, LLC's

Guilty Plea and Plea Agreement

At all times relevant herein, defendant BETA OPERATING COMPANY, LLC, doing business as "Beta Offshore," its co-defendant and parent AMPLIFY ENERGY CORP., and its co-defendant and affiliate SAN PEDRO BAY PIPELINE COMPANY (collectively, "defendants"), owned and operated the 17-mile San Pedro Bay Pipeline (the "Pipeline"), which shipped crude oil from defendants' Platform Elly in San Pedro Bay to defendants' onshore terminal station in Long Beach, California.  All portions of Platform Elly and the Pipeline were located in the waters of the contiguous zone of the United States and/or in the Central District of California.

**A.   The Anchor Drags**

Defendants maintain that: 1) during a storm on January 25, 2021, one or more ships' anchors crossed over and struck an offshore and underwater section of the Pipeline, and dragged a 4,000-foot portion of the Pipeline approximately 105 feet from its original location; 2) the first anchor struck the Pipeline multiple times on the morning of January 25, 2021, damaging and displacing the Pipeline; 3) the second anchor struck the Pipeline on the morning of January 25, 2021, also damaging and displacing the Pipeline; 4) as it was displacing the Pipeline, the second anchor slid along the length of the Pipeline until it reached the location where the Pipeline ultimately leaked; and 5) the anchor drags likely were the primary cause of the oil spill on October 1 and 2, 2021 described below.  The government acknowledges that these anchor drags appear to have occurred, that the anchor drags may have weakened the Pipeline, and that the anchor

drags may have been one cause of the oil spill on October 1 and 2, 2021.

Defendants maintain that they did not learn of the January 2021 anchor drags until after the oil spill on October 1 and 2, 2021.  In an ongoing civil action, captioned Peter Moses Gutierrez et al. v. Amplify Energy Corporation et al. (C.D. Cal. Case No. 8:21-CV-01628-DOC), defendants claim, among other things, that the ships allegedly involved in the anchor drags negligently failed to notify defendants of the anchor drags and therefore those ships also are responsible for the oil spill described below.

**B.   The Pipeline Rupture**

At approximately 4:05 p.m. on October 1, 2021, the Pipeline ruptured approximately 4.7 miles from shore, in the contiguous zone of the United States, at the approximate location of the apparent anchor drags on January 25, 2021.

Earlier in the day on October 1, 2021, defendants' crewmembers had been dealing with an "upset" on Platform Elly, which involved the inversion of crude oil and produced water in a "knockout vessel" on Platform Elly.  Such upsets had happened in the past on Platform Elly, but the upset on October 1 was more severe and took longer to fix than previous upsets.  As a result of the upset, defendants' crewmembers pumped crude oil containing a higher-than-normal concentration of produced water past the flow and pressure meters and into the Pipeline.

**C.   Defendants' Leak Detection System**

At all times relevant herein, defendants used a leak detection system ("LDS") for the Pipeline.  Essentially, the LDS was an automated system that was intended to monitor and compare, among

other things, the amount of oil being pumped into the Pipeline at Platform Elly with the amount of oil coming out of the Pipeline onshore at defendants' terminal station, and monitor the pressure at both ends of the Pipeline.  When the data indicated a potential leak, the LDS issued visual and audio alarms to alert defendants' control-room operators at Platform Elly and onshore about a potential leak. The LDS is designed to indicate the estimated size and rate of a potential leak, as well as the suspected location of a potential leak.

On October 1 and 2, 2021, defendants' crewmembers believed, incorrectly, that the LDS alarms (as described below) were caused by the higher-than-normal quantity of produced water being pumped through the Pipeline as a result of the upset described above.  In addition, all of the LDS alarms on October 1 and 2, 2021, indicated that the likely location of the suspected leak was "Mile 0," which corresponded to Platform Elly, rather than the undersea Pipeline itself.  In response to the alarms described below and in reliance on the "Mile 0" indication, defendants' crewmembers searched multiple times for a leak on Platform Elly but found nothing.

The company that provided the LDS to defendants (the "LDS Provider") offered daily technical support to its clients, including defendants.  The LDS Provider had a phone number (staffed 24 hours a day) through which its clients could ask for help regarding LDS alarms and how to respond, including for an additional fee after regular business hours.  On October 1 and 2, 2021, defendants never contacted the LDS Provider to ask for assistance regarding the eight LDS alarms described below.

1

      **D.    Defendants' Response to the Spill**

2      At approximately 4:10 p.m. on October 1, 2021, defendants' LDS

3  issued an alarm for the first time that day, indicating a potential

4  leak in the Pipeline.  In response to this alarm, defendants shut

5  down the Pipeline at approximately 5:10 p.m. on October 1, 2021.  At

6  approximately 5:40 p.m., defendants' crewmembers, due in part to

7  issues relating to the earlier upset, incorrectly assessed there was

8  no leak, and started pumping crude oil through the Pipeline again.

9      At approximately 5:52 p.m. on October 1, 2021, defendants' LDS

10  issued another alarm.  In response, at approximately 5:53 p.m. on

11  October 1, 2021, defendants shut down the Pipeline for the second

12  time that day.  At approximately 7:03 p.m. on October 1, 2021,

13  defendants' crewmembers, incorrectly assessing there was no leak,

14  started pumping crude oil through the Pipeline again.

15      At approximately 7:15 p.m. on October 1, 2021, defendants' LDS

16  issued another alarm.  In response, at approximately 7:42 p.m. on

17  October 1, 2021, defendants shut down the Pipeline for the third time

18  that day.  At approximately 8:29 p.m. on October 1, 2021, defendants'

19  crewmembers, incorrectly assessing there was no leak, started pumping

20  crude oil through the Pipeline again.

21      At approximately 8:39 p.m. on October 1, 2021, defendants' LDS

22  issued another alarm.  In response, at approximately 8:43 p.m. on

23  October 1, 2021, defendants shut down the Pipeline for the fourth

24  time that day.  At approximately 9:12 p.m. on October 1, 2021,

25  defendants' crewmembers, incorrectly assessing there was no leak,

26  started pumping crude oil through the Pipeline again.

27      At approximately 9:23 p.m. on October 1, 2021, defendants' LDS

28  issued another alarm.  In response, at approximately 9:24 p.m. on

October 1, 2021, defendants shut down the Pipeline for the fifth time that day.  At approximately 9:44 p.m. on October 1, 2021, defendants' crewmembers, incorrectly assessing there was no leak, started pumping crude oil through the Pipeline again.

At approximately 10:01 p.m. on October 1, 2021, defendants' LDS issued another alarm.  In response, at approximately 10:33 p.m. on October 1, 2021, defendants shut down the Pipeline for the sixth time that day.  At approximately 11:15 p.m. on October 1, 2021, defendants' crewmembers, incorrectly assessing there was no leak, started pumping crude oil through the Pipeline again.

At approximately 11:30 p.m. on October 1, 2021, defendants' LDS issued another alarm.  Defendants' crewmembers, incorrectly assessing there was no leak, continued pumping crude oil through the Pipeline until approximately 2:27 a.m. on October 2, 2021, when they shut it down for the seventh time.

The main reason why defendants' crewmembers continued pumping crude oil through the Pipeline from approximately 11:15 p.m. on October 1 to approximately 2:27 a.m. on October 2 was so that they could conduct a "manual leak detection test" to further investigate whether there was an actual leak.  In a manual leak detection test, crewmembers track flow meter data at each end of the Pipeline to monitor the quantities of crude oil being pumped into the Pipeline at Platform Elly and the quantities of oil arriving onshore at the end of the Pipeline, at specific intervals every thirty minutes, to determine if there is an imbalance suggesting a leak.  Defendants' crewmembers conducted a manual leak detection test, taking readings from flow meters at the respective ends of the Pipeline every thirty minutes from approximately 12:20 a.m. to 2:20 a.m. on October 2,

2021.  The flow meter readings taken at approximately 12:50 a.m. and
1:20 a.m. each revealed that approximately ten barrels more was being
pumped into the Pipeline at Platform Elly than was arriving onshore,
further indicating a potential leak.  Defendants' crewmembers
incorrectly believed that the ten-barrel difference was the result of
the higher quantity of produced water pumped into the Pipeline
earlier in the day.  By continuing to pump oil through the Pipeline
for approximately one hour after the crewmembers had received the
results of two consecutive flow meter readings that revealed a ten-
barrel difference and after the LDS already had issued seven alarms,
defendants negligently discharged oil in harmful quantities into San
Pedro Bay, in the contiguous zone of the United States, in violation
of 33 U.S.C. §§ 1321(b)(3), 1319(c)(1)(A).

     At approximately 2:30 a.m. on October 2, 2021, after the manual
leak detection tests, defendants decided to request that a third
party conduct a "line ride," in which a boat travels above the course
of the underwater Pipeline, from shore to Platform Elly, in order to
determine if there is any indication of an oil spill or other
problems.  This was the first time defendants ever had requested a
line ride for the Pipeline in response to LDS alarms, and the first
time that defendants ever had requested a nighttime line ride for the
Pipeline.  The line ride was conducted from approximately 3:30 a.m.
to 4:30 a.m. on October 2, 2021, in the dark of night using
flashlights on a boat.  Defendants' personnel understood that it
would be difficult for a line ride to identify an oil spill in the
middle of the night by means of a flashlight.  The third party
conducting the line ride did not identify any sign of a leak during
the line ride and reported that to defendants' personnel.

As a result of defendants' continued erroneous belief that there was no leak, defendants started pumping oil through the Pipeline at approximately 5:11 a.m. on October 2, 2021.

At approximately 5:28 a.m. on October 2, 2021, defendants' LDS issued another alarm.  Nonetheless, defendants did not shut the Pipeline down for the eighth and final time until 6:04 a.m., when it decided – according to its control-room logbook – to "wait for daylight" (sunrise was at approximately 6:47 a.m. that day).  By pumping crude oil through the Pipeline from approximately 5:11 a.m. to 6:04 a.m. on October 2, 2021, defendants negligently discharged oil in harmful quantities into San Pedro Bay, in the contiguous zone of the United States, in violation of 33 U.S.C. §§ 1321(b)(3), 1319(c)(1)(A).

At approximately 7:00 a.m. on October 2, 2021, at defendants' request, a third party began conducting a second line ride.  With the benefit of daylight, the second line ride identified the spill at approximately 8:00 a.m. and notified defendants.  Defendants thereafter initiated their oil spill response plan, including, at approximately 8:30 a.m., contacting their disaster response firm.

### E.    The Quantity of Discharged Oil

The leak from the Pipeline, beginning at approximately 4:05 p.m. October 1, 2021, and ending at approximately 6:04 a.m. on October 2, 2021, caused approximately 588 barrels of crude oil to spill into the San Pedro Bay.  This was a quantity that was harmful to the public health, welfare, and environment of the United States.

### F.    The Impact of the Spill

The oil spill impacted to varying degrees a diverse group of stakeholders, ranging, for example, from local surfers and

beachgoers, to recreational and commercial fishermen, to tourism businesses, to individuals and businesses involved in the Great Pacific Airshow that was scheduled for its final day on October 3, 2021 but was cancelled, to nonprofits involved in the clean-up of the oil spill, as well as local, state, and federal governmental agencies. For example, after the spill, an area of approximately 650 square miles was closed to fishing, including approximately 45 miles of shoreline. Two days after the spill, Governor Newsom declared a state of emergency due to the far-reaching impacts of the spill and the related response efforts.

Defendants have paid the vast majority of expenses related to the clean-up of the spill. However, the Coast Guard has incurred approximately $5,844,700 to date in direct and indirect expenses in responding to the spill, including funds expended out of the Oil Spill Liability Trust Fund administered by the Coast Guard. On July 15, 2022, the Coast Guard submitted approximately $656,500 of those expenses to defendants for payment, which invoice was paid on August 17, 2022. Defendants intend to promptly pay any and all remaining amounts once invoices are received from the Coast Guard.