STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MATTHEW O'BRIEN (Cal. Bar No. 261568)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Environmental and Community Safety Crimes Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-8644/3819
    Facsimile: (213) 894-0141
    E-mail:   Matthew.O'Brien@usdoj.gov
             Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-226-DOC |
|---|---|
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT SAN PEDRO BAY PIPELINE COMPANY |
| v. | |
| AMPLIFY ENERGY CORP., BETA OPERATING COMPANY, LLC, d/b/a "Beta Offshore," and SAN PEDRO BAY PIPELINE COMPANY, | |
| Defendants. | |

    1.   This constitutes the binding plea agreement between defendant SAN PEDRO BAY PIPELINE COMPANY ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

//

//

1                          RULE 11(c)(1)(C) AGREEMENT

2          2.   Defendant understands that this agreement is entered into

3    pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).

4    Accordingly, defendant understands that, if the Court determines that

5    it will not accept this agreement, absent a breach of this agreement

6    by defendant prior to that determination and whether or not defendant

7    elects to withdraw any guilty plea entered pursuant to this

8    agreement, this agreement will, with the exception of paragraph 20

9    below, be rendered null and void and both defendant and the USAO will

10   be relieved of their obligations under this agreement.  Defendant

11   agrees, however, that if defendant breaches this agreement prior to

12   the Court's determination whether or not to accept this agreement,

13   the breach provisions of this agreement, paragraphs 22 and 23 below,

14   will control, with the result that defendant will not be able to

15   withdraw any guilty plea entered pursuant to this agreement, the USAO

16   will be relieved of all of its obligations under this agreement, and

17   the Court's failure to follow any recommendation or request regarding

18   sentence set forth in this agreement will not provide a basis for

19   defendant to withdraw defendant's guilty plea.

20                         DEFENDANT'S OBLIGATIONS

21        3.   Defendant agrees to:

22             a.   At the earliest opportunity requested by the USAO and

23   provided by the Court, appear and plead guilty to the single-count

24   indictment in United States v. AMPLIFY ENERGY CORP. et al., CR No.

25   21-226-DOC, which charges defendant with negligent discharge of oil

26   into the contiguous zone of the United States, in violation of 33

27   U.S.C. §§ 1321(b)(3), 1319(c)(1)(A).

28             b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement and affirmatively recommend to the Court that it impose sentence in accordance with paragraph 15 of this agreement.

d.   Appear for all court appearances, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

h.   Be jointly and severally liable for the criminal fine that the Court imposes on co-defendant AMPLIFY ENERGY CORP.

i.   Agree to, and not oppose the imposition of, the conditions of probation set forth in Exhibit 1, attached hereto and incorporated herein by reference.

<u>THE USAO'S OBLIGATIONS</u>

4.   The USAO agrees to:

a.   Not contest facts agreed to in this agreement.

b.   Abide by all agreements regarding sentencing contained in this agreement and affirmatively recommend to the Court that it impose a sentence in accordance with paragraph 15 of this agreement.

c.   Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371), not further criminally prosecute defendant for violations

arising out of defendant's conduct described in the agreed-to factual basis attached to this agreement as Exhibit 2.  Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.  Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

COMPANY AUTHORIZATION

5.  Defendant represents that it is authorized to enter into this agreement.  On or before the change of plea hearing pursuant to this agreement, defendant shall provide the USAO and the Court with a notarized legal document certifying that defendant is authorized to enter into and comply with all of the provisions of this agreement. Such resolution shall designate the company representative who is authorized to take the actions specified in this agreement, including pleading guilty on behalf of the company, and shall also state that all legal formalities for such authorizations have been observed.

ORGANIZATIONAL CHANGES AND APPLICABILITY

6.  This agreement shall bind defendant, its successor corporation(s), if any, and any other person or entity that assumes the liabilities contained herein ("successor-in-interest").  No change in name, change in corporate or individual control, business reorganization, change in ownership, merger, change of legal status, sale or purchase of assets, or similar action shall alter defendant's responsibilities under this agreement.  Defendant shall not engage in

4

1   any action to seek to avoid the obligations and conditions set forth
2   in this agreement.

3                            RESPONDEAT SUPERIOR

4        7.    The parties stipulate and agree that under principles of
5   corporate liability and respondeat superior, as these principles
6   apply in this case, defendant is liable for the actions of its agents
7   and employees.  New York Central and Hudson River R.R. v. United
8   States, 212 U.S. 481, 495 (1909); United States v. Beusch, 596 F.2d
9   871, 877-878 (9th Cir. 1979); United States v. Hilton Hotels
10  Corporation, 467 F.2d 1000, 1004-1007 (9th Cir. 1972).

11                          NATURE OF THE OFFENSE

12       8.    Defendant understands that for defendant to be guilty of
13  the crime charged in the indictment, that is, negligent discharge of
14  oil into the contiguous zone of the United States, in violation of
15  Title 33, United States Code, Sections 1321(b)(3), 1319(c)(1)(A), the
16  following must be true: (1) a person; (2) discharged oil; (3) into
17  waters of the United States . . . or into the contiguous zone; (4) in
18  a quantity that may be harmful; and (5) acted negligently.

19                        PENALTIES AND RESTITUTION

20       9.    Defendant understands that the statutory maximum sentence
21  that the Court can impose for a violation of Title 33, United States
22  Code, Sections 1321(b)(3), 1319(c)(1)(A), is: 5 years of probation; a
23  fine of $25,000 per day of violation, or $200,000 per offense, or
24  twice the gross gain or gross loss resulting from the offense,
25  whichever is greatest; and a mandatory special assessment of $125.

26       10.   Regarding restitution, the parties agree as follows:

27

28

                                    5

a.   Pursuant to 18 U.S.C. § 3663, the Court may order that defendant make restitution to any victims of the offense to which defendant is pleading guilty.

b.   Many of the victims of defendant's offense will be able to pursue reimbursement for their alleged losses through (1) the ongoing civil action captioned <u>Peter Moses Gutierrez et al. v. Amplify Energy Corporation et al.</u> (C.D. Cal. Case No. 8:21-CV-01628-DOC); and (2) the claims process under the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 <u>et seq.</u> (the "OPA Process").

c.   As part of defendant's probationary terms, defendant is agreeing to make whole governmental agencies and entities that have incurred direct and indirect expenses as the result of their response in the aftermath of defendant's offense, where such expenses have not yet been reimbursed by defendant, including the U.S. Coast Guard and the Oil Spill Liability Trust Fund.

d.   Here, the large number of potential victims of defendant's offense and the potential complexity of those victims' claims justify the Court's invocation of 18 U.S.C. § 3663(a)(1)(B)(ii) in order to decline to issue an order of restitution in this matter.  In addition, the OPA Process, the federal civil case, and the probation terms of this case provide alternative means for victims of defendant's offense to be made whole.

<u>SUSPENSION/REVOCATION/DEBARMENT</u>

11.  Defendant understands that if defendant holds any regulatory license or permit, the conviction in this case may result in the suspension or revocation of such license and/or permit.  By this agreement, the USAO makes no representation or promise

6

concerning suspension or debarment of defendant from contracting with the United States or with any office, agency, or department thereof. Suspension and debarment of organizations convicted under various federal regulatory protection and criminal statutes is a discretionary administrative action solely within the authority of the federal contracting agencies.

12.   Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

## FACTUAL BASIS

13.   Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts attached hereto as Exhibit 2, and incorporated herein by reference, and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

## SENTENCING FACTORS AND AGREED-UPON SENTENCE

14.   Defendant and the USAO agree and stipulate that, pursuant to United States Sentencing Guidelines ("U.S.S.G.") §§ 8C2.1 and 8C2.10, the sentencing guidelines are not applicable in determining the fine for an organization violating 33 U.S.C. §§ 1321(b)(3), 1319(c)(1)(A), but all other sections of Chapter 8 of the U.S.S.G. are applicable in this case, including the provisions regarding probation.  Defendant understands that in determining defendant's sentence, the Court is also required to consider the factors set forth in Title 18, United States Code, Sections 3553(a) and 3572,

including the kinds of sentences and sentencing ranges established under the Sentencing Guidelines.

15. Pursuant to Chapter 8 of the Sentencing Guidelines and the factors set forth in Title 18, United States Code, Sections 3553(a) and 3572, including the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant, the parties agree to advocate and affirmatively recommend that the Court sentence defendant as follows:

a. <u>Probation</u>: Defendant should be sentenced to probation for a term of four years with conditions to be fixed by the Court. The probationary terms shall include those terms set forth in Exhibit 1 to this agreement, which is incorporated herein by reference.

b. <u>Criminal Fine</u>: Defendant shall be jointly and severally liable for the criminal fine that the Court imposes on co-defendant AMPLIFY ENERGY CORP.

c. <u>Special Assessment</u>: Defendant shall pay a total special assessment of $125.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

16. Defendant understands that by pleading guilty, defendant gives up the following rights:

a. The right to persist in a plea of not guilty.

b. The right to a speedy and public trial by jury.

1        c.    The right to be represented by counsel at trial.

2 Defendant understands, however, that, defendant retains the right to

3 be represented by counsel at every other stage of the proceeding.

4        d.    The right to be presumed innocent and to have the

5 burden of proof placed on the government to prove defendant guilty

6 beyond a reasonable doubt.

7        e.    The right to confront and cross-examine witnesses

8 against defendant.

9        f.    The right to testify and to present evidence in

10 opposition to the charges, including the right to compel the

11 attendance of witnesses to testify.

12        g.    Any and all rights to pursue any affirmative defenses,

13 Fourth Amendment or Fifth Amendment claims, and other pretrial

14 motions that have been filed or could be filed.

15 <u>WAIVER OF APPEAL OF CONVICTION</u>

16   17.  Defendant understands that, with the exception of an appeal

17 based on a claim that defendant's guilty plea was involuntary, by

18 pleading guilty defendant is waiving and giving up any right to

19 appeal defendant's conviction on the offense to which defendant is

20 pleading guilty.  Defendant understands that this waiver includes,

21 but is not limited to, arguments that the statute to which defendant

22 is pleading guilty is unconstitutional, and any and all claims that

23 the statement of facts provided herein is insufficient to support

24 defendant's plea of guilty.

25 <u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

26   18.  Defendant agrees that, provided the Court imposes the

27 sentence specified in paragraph 15 above, defendant gives up the

28 right to appeal any portion of that sentence, and the procedures and

1  calculations used to determine and impose any portion of that
2  sentence.

3      19.  The USAO agrees that, provided the Court imposes the
4  sentence specified in paragraph 15 above, the USAO gives up its right
5  to appeal any portion of that sentence, and the procedures and
6  calculations used to determine and impose any portion of that
7  sentence.

8                 RESULT OF WITHDRAWAL OF GUILTY PLEA

9      20.  Defendant agrees that if, after entering a guilty plea
10 pursuant to this agreement, defendant seeks to withdraw and succeeds
11 in withdrawing defendant's guilty plea on any basis other than a
12 claim and finding that entry into this plea agreement was
13 involuntary, then (a) the USAO will be relieved of all of its
14 obligations under this agreement; and (b) should the USAO choose to
15 pursue any charge or any civil, administrative, or regulatory action
16 that was either dismissed or not filed as a result of this agreement,
17 then (i) any applicable statute of limitations will be tolled between
18 the date of defendant's signing of this agreement and the filing
19 commencing any such action; and (ii) defendant waives and gives up
20 all defenses based on the statute of limitations, any claim of pre-
21 indictment delay, or any speedy trial claim with respect to any such
22 action, except to the extent that such defenses existed as of the
23 date of defendant's signing this agreement.

24                   EFFECTIVE DATE OF AGREEMENT

25     21.  This agreement is effective upon signature and execution of
26 all required certifications by defendant, defendant's counsel, and an
27 Assistant United States Attorney.

28

1

<u>BREACH OF AGREEMENT</u>

2       22.  Defendant agrees that if defendant, at any time after the

3  signature of this agreement and execution of all required

4  certifications by defendant, defendant's counsel, and an Assistant

5  United States Attorney, knowingly violates or fails to perform any of

6  defendant's obligations under this agreement ("a breach"), the USAO

7  may declare this agreement breached.  All of defendant's obligations

8  are material, a single breach of this agreement is sufficient for the

9  USAO to declare a breach, and defendant shall not be deemed to have

10  cured a breach without the express agreement of the USAO in writing.

11  If the USAO declares this agreement breached, and the Court finds

12  such a breach to have occurred, then: (a) if defendant has previously

13  entered a guilty plea pursuant to this agreement, defendant will not

14  be able to withdraw the guilty plea, (b) the USAO will be relieved of

15  all its obligations under this agreement, and (c) the Court's failure

16  to follow any recommendation or request regarding sentence set forth

17  in this agreement will not provide a basis for defendant to withdraw

18  defendant's guilty plea.

19       23.  Following the Court's finding of a knowing breach of this

20  agreement by defendant, should the USAO choose to pursue any charge

21  or any civil, administrative, or regulatory action that was either

22  dismissed or not filed as a result of this agreement, then:

23            a.   Defendant agrees that any applicable statute of

24  limitations is tolled between the date of defendant's signing of this

25  agreement and the filing commencing any such action.

26            b.   Defendant waives and gives up all defenses based on

27  the statute of limitations, any claim of pre-indictment delay, or any

28  speedy trial claim with respect to any such action, except to the

1    extent that such defenses existed as of the date of defendant's

2    signing this agreement.

3           c.    Defendant agrees that: (i) any statements made by

4    defendant, under oath, at the guilty plea hearing (if such a hearing

5    occurred prior to the breach); (ii) the agreed to factual basis

6    statement in this agreement; and (iii) any evidence derived from such

7    statements, shall be admissible against defendant in any such action

8    against defendant, and defendant waives and gives up any claim under

9    the United States Constitution, any statute, Rule 410 of the Federal

10   Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal

11   Procedure, or any other federal rule, that the statements or any

12   evidence derived from the statements should be suppressed or are

13   inadmissible.

14        COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

15                          OFFICE NOT PARTIES

16   24.   Defendant understands that the Court and the United States

17   Probation and Pretrial Services Office are not parties to this

18   agreement and need not accept any of the USAO's sentencing

19   recommendations or the parties' agreements to facts, sentencing

20   factors, or sentencing.  Defendant understands that the Court will

21   determine the facts, sentencing factors, and other considerations

22   relevant to sentencing and will decide for itself whether to accept

23   and agree to be bound by this agreement.

24   25.   Defendant understands that both defendant and the USAO are

25   free to: (a) supplement the facts by supplying relevant information

26   to the United States Probation and Pretrial Services Office and the

27   Court, (b) correct any and all factual misstatements relating to the

28   Court's Sentencing Guidelines calculations and determination of

sentence, and (c) argue on appeal and collateral review that the

Court's Sentencing Guidelines calculations and the sentence it

chooses to impose are not error, although each party agrees to

maintain its view that the sentence referenced in paragraph 15 is

consistent with the facts of this case.  While this paragraph permits

both the USAO and defendant to submit full and complete factual

information to the United States Probation and Pretrial Services

Office and the Court, even if that factual information may be viewed

as inconsistent with the facts agreed to in this agreement, this

paragraph does not affect defendant's and the USAO's obligations not

to contest the facts agreed to in this agreement.

NO ADDITIONAL AGREEMENTS

26.  Defendant understands that, except as set forth herein,

there are no promises, understandings, or agreements between the USAO

and defendant or defendant's attorney, and that no additional

promise, understanding, or agreement may be entered into unless in a

writing signed by all parties or on the record in court.

//

//

//

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

27.  The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

STEPHANIE S. CHRISTENSEN
Acting United States Attorney

_____          August 26, 2022
MATTHEW O'BRIEN                           Date
BRIAN FAERSTEIN
Assistant United States Attorneys


_____          _____
                                          Date
Authorized Representative of
Defendant SAN PEDRO BAY PIPELINE
COMPANY


_____          August 26, 2022
BRIAN A. BENCZKOWSKI                       Date
MARK C. HOLSCHER
Kirkland & Ellis LLP
Attorneys for Defendant SAN PEDRO
BAY PIPELINE COMPANY


CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety.  I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with defendant's attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms.  I have discussed the evidence with defendant's

14

## PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

27. The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

STEPHANIE S. CHRISTENSEN
Acting United States Attorney

_____          _____
MATTHEW O'BRIEN                           Date
BRIAN FAERSTEIN
Assistant United States Attorneys

_____          _____
        *Mt Will*                         8/26/2022
                                          Date
Authorized Representative of
Defendant SAN PEDRO BAY PIPELINE
COMPANY

_____          _____
BRIAN A. BENCZKOWSKI                      Date
MARK C. HOLSCHER
Kirkland & Ellis LLP
Attorneys for Defendant SAN PEDRO
BAY PIPELINE COMPANY

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with defendant's attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with defendant's

14

attorney, and defendant's attorney has advised me of defendant's

rights, of possible pretrial motions that might be filed, of possible

defenses that might be asserted either prior to or at trial, of the

sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant

Sentencing Guidelines provisions, and of the consequences of entering

into this agreement.  No promises, inducements, or representations of

any kind have been made to me or defendant other than those contained

in this agreement.  No one has threatened or forced me or defendant

in any way to enter into this agreement.  I am satisfied with the

representation of defendant's attorney in this matter, and defendant

is pleading guilty because defendant is guilty of the charge and

wishes to take advantage of the promises set forth in this agreement,

and not for any other reason.

_____          8/26/2022
                                          Date
Authorized Representative of
Defendant SAN PEDRO BAY PIPELINE
COMPANY


CERTIFICATION OF DEFENDANT'S ATTORNEY

    I am defendant's attorney.  I have carefully and thoroughly

discussed every part of this agreement with my client.  Further, I

have fully advised my client of its rights, of possible pretrial

motions that might be filed, of possible defenses that might be

asserted either prior to or at trial, of the sentencing factors set

forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

provisions, and of the consequences of entering into this agreement.

To my knowledge: no promises, inducements, or representations of any

kind have been made to my client other than those contained in this

15

agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

_____  August 26, 2022
BRIAN A. BENCZKOWSKI     Date
MARK C. HOLSCHER
Kirkland & Ellis LLP
Attorneys for Defendant SAN PEDRO
BAY PIPELINE COMPANY

**Exhibit 1**

Additional Terms of Probation

The following terms of probation shall apply to defendants AMPLIFY ENERGY CORP., BETA OPERATING COMPANY, LLC, doing business as "Beta Offshore," and SAN PEDRO BAY PIPELINE COMPANY (collectively, "defendants"), in addition to the standard conditions of probation, as applicable, to be set by the Court pursuant to the Second Amended General Order No. 20-04.

1.    Defendants shall make whole governmental agencies and entities, including the United States Coast Guard and the Oil Spill Liability Trust Fund administered by the Coast Guard, for direct and indirect expenses incurred as the result of the governmental response in the aftermath of the spill from the 17-mile San Pedro Bay Pipeline (the "Pipeline"), in accordance with submissions for payment received by those agencies and where such expenses have not yet been reimbursed by defendants at the time of entry of defendants' guilty pleas.  To date, the Coast Guard has incurred approximately $5,844,700 in direct and indirect expenses in responding to the spill, including funds expended out of the Oil Spill Liability Trust Fund.  Defendants have begun to make repayment toward those expenses.

2.    Within 60 days of defendants' entry of their guilty pleas, defendants shall ensure all operational employees and related management personnel are trained and instructed, in compliance with California Government Code Section 8670.25.5, to immediately notify and update all appropriate response agencies, including the California State Office of Emergency Services ("Cal-OES"), and any local unified environmental program or agency, of any release or threatened release of a hazardous material or pollutant substance

from any pipeline, conveyance system, or any other operation of defendants in the State of California, as required by law.

3.   At the time they are authorized to restart production through the Pipeline, defendants shall ensure they are using a leak detection system on the Pipeline that provides the Best Achievable Protection using the Best Achievable Technology, as those terms are defined in Title 14 of the California Code of Regulations, Section 790, subdivision (b)(5), and Section 790, subdivision (b)(6).  The new leak detection system will run concurrently with the previous leak detection system for up to 180 days after production is authorized to restart to ensure that the new leak detection system is appropriately calibrated to the Pipeline.

4.   The operator of the Pipeline shall report any indication of lateral or elevation movement as identified by the GPS tracking from remotely operated vehicle ("ROV") visual inspections and report any indication of damages identified from the visual inspections, such as the concrete casing being damaged or displaced.  Data indicating deviation from the permitted location of the Pipeline shall be provided to the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA"), the State Lands Commission, and the State Fire Marshal within seven (7) days after the ROV videos are processed and provided to defendants.

5.   After each leak detection alarm, defendants shall notify the Cal-OES State Warning Center of the leak detection alarm.

6.   Defendants shall establish and maintain a contract with an oil spill response organization, vessel service company, or other entity that will promptly deploy upon request, and that has the

1  capability to detect oil on the surface of the water at night or in
2  low-light conditions.

3       7.   Defendants must conduct actual visual inspections of the
4  Pipeline semiannually (*e.g.,* an ROV).  Driving a boat on the surface
5  of the water over the route of the Pipeline is not sufficient.
6  Anomalies found on the Pipeline shall be reported to PHMSA, the
7  United States Department of Interior Bureau of Safety and
8  Environmental Enforcement ("BSEE"), and the California State Fire
9  Marshal.

10      8.   Defendants shall revise the Risk & Hazard Analysis in their
11 oil spill contingency plan that has been approved by the California
12 Department of Fish and Wildlife, Office of Spill Prevention and
13 Response ("OSPR") [Plan # M5-24-3231] to expressly account for the
14 risk to pipelines from anchors, vessels, or fishing operations.

15      9.   Defendants shall resubmit its oil spill contingency plan to
16 OSPR [Plan # M5-24-3231], with updates reflecting the changes
17 required by these probationary terms, and notify the United States
18 Probation and Pretrial Services Office ("Probation") and the Chief of
19 the Environmental and Community Safety Crimes Section ("ECSCS") at
20 the United States Attorney's Office for the Central District of
21 California ("USAO") that they have done so.

22      10.  Defendants shall review and ensure adequacy of the existing
23 O & M Manual and sections related to Leak Detection (Section 5.02),
24 Abnormal Operating Conditions (PSOM section 17.08), and Emergency
25 Response Procedures (PSOM Section 17.09).  Once the review and
26 changes are completed, defendants shall submit updated documents to
27 OSPR and notify Probation and the Chief of ECSCS at the USAO that
28 they have done so.

11.    Defendants shall review and update the SPBPL 16" Manual Leak Detection Procedure (SPBPL-001.00 rev: REA 7/11) to reflect current practices and compliance with probation terms.  Once the review and updates are completed, defendants shall submit updated documents to OSPR and notify Probation and the Chief of ECSCS at the USAO that they have done so.

12.    Defendants shall review and update all of the spill notification procedures found in their plan submitted to OSPR [Plan # M5-24-3231] to ensure compliance with requirements for immediate notification pursuant to California Government Code Section 8670.25.5.  Once completed, defendants shall submit the updated procedures to OSPR and notify Probation and the Chief of ECSCS at the USAO that they have done so.

13.    Defendants shall provide training to operational employees and related management personnel on all requirements and updated spill notification procedures for immediate notification, in compliance with California Government Code Section 8670.25.5, to appropriate federal, state and local authorities, including the United States Coast Guard National Response Center and the Cal-OES State Warning Center.

14.    Defendants shall make modifications to their existing pipeline related procedures.  These modifications will require financial investment of at least $250,000 and defendants will use best efforts to implement any procedural improvements that their third-party consultant Eagle Energy Services LLC concludes to be necessary before the Pipeline is restarted with the pumping of oil, to the extent such proposed procedural improvements are not in

4

conflict with any requirements from PHMSA and BSEE, the agencies responsible for approving the restart of operations on the Pipeline.

15.  Defendants shall provide mandatory training to operational employees and related management personnel on these updated operational policies and procedures, and engage a qualified third-party provider to provide updated training on shipping, shut-down, and restart before restarting Pipeline operations.

1                                          **Exhibit 2**

2       <u>Statement of Facts in Support of SAN PEDRO BAY PIPELINE COMPANY's</u>

3                          <u>Guilty Plea and Plea Agreement</u>

4       At all times relevant herein, defendant SAN PEDRO BAY PIPELINE

5 COMPANY, its co-defendant and parent AMPLIFY ENERGY CORP., and its

6 co-defendant and affiliate BETA OPERATING COMPANY, LLC, doing

7 business as "Beta Offshore" (collectively, "defendants"), owned and

8 operated the 17-mile San Pedro Bay Pipeline (the "Pipeline"), which

9 shipped crude oil from defendants' Platform Elly in San Pedro Bay to

10 defendants' onshore terminal station in Long Beach, California.  All

11 portions of Platform Elly and the Pipeline were located in the waters

12 of the contiguous zone of the United States and/or in the Central

13 District of California.

14      **A.   The Anchor Drags**

15       Defendants maintain that: 1) during a storm on January 25, 2021,

16 one or more ships' anchors crossed over and struck an offshore and

17 underwater section of the Pipeline, and dragged a 4,000-foot portion

18 of the Pipeline approximately 105 feet from its original location;

19 2) the first anchor struck the Pipeline multiple times on the morning

20 of January 25, 2021, damaging and displacing the Pipeline; 3) the

21 second anchor struck the Pipeline on the morning of January 25, 2021,

22 also damaging and displacing the Pipeline; 4) as it was displacing

23 the Pipeline, the second anchor slid along the length of the Pipeline

24 until it reached the location where the Pipeline ultimately leaked;

25 and 5) the anchor drags likely were the primary cause of the oil

26 spill on October 1 and 2, 2021 described below.  The government

27 acknowledges that these anchor drags appear to have occurred, that

28 the anchor drags may have weakened the Pipeline, and that the anchor

drags may have been one cause of the oil spill on October 1 and 2, 2021.

Defendants maintain that they did not learn of the January 2021 anchor drags until after the oil spill on October 1 and 2, 2021.  In an ongoing civil action, captioned <u>Peter Moses Gutierrez et al. v. Amplify Energy Corporation et al.</u> (C.D. Cal. Case No. 8:21-CV-01628-DOC), defendants claim, among other things, that the ships allegedly involved in the anchor drags negligently failed to notify defendants of the anchor drags and therefore those ships also are responsible for the oil spill described below.

**B.   The Pipeline Rupture**

At approximately 4:05 p.m. on October 1, 2021, the Pipeline ruptured approximately 4.7 miles from shore, in the contiguous zone of the United States, at the approximate location of the apparent anchor drags on January 25, 2021.

Earlier in the day on October 1, 2021, defendants' crewmembers had been dealing with an "upset" on Platform Elly, which involved the inversion of crude oil and produced water in a "knockout vessel" on Platform Elly.  Such upsets had happened in the past on Platform Elly, but the upset on October 1 was more severe and took longer to fix than previous upsets.  As a result of the upset, defendants' crewmembers pumped crude oil containing a higher-than-normal concentration of produced water past the flow and pressure meters and into the Pipeline.

**C.   Defendants' Leak Detection System**

At all times relevant herein, defendants used a leak detection system ("LDS") for the Pipeline.  Essentially, the LDS was an automated system that was intended to monitor and compare, among

other things, the amount of oil being pumped into the Pipeline at
Platform Elly with the amount of oil coming out of the Pipeline
onshore at defendants' terminal station, and monitor the pressure at
both ends of the Pipeline.  When the data indicated a potential leak,
the LDS issued visual and audio alarms to alert defendants' control-
room operators at Platform Elly and onshore about a potential leak.
The LDS is designed to indicate the estimated size and rate of a
potential leak, as well as the suspected location of a potential
leak.

On October 1 and 2, 2021, defendants' crewmembers believed,
incorrectly, that the LDS alarms (as described below) were caused by
the higher-than-normal quantity of produced water being pumped
through the Pipeline as a result of the upset described above.  In
addition, all of the LDS alarms on October 1 and 2, 2021, indicated
that the likely location of the suspected leak was "Mile 0," which
corresponded to Platform Elly, rather than the undersea Pipeline
itself.  In response to the alarms described below and in reliance on
the "Mile 0" indication, defendants' crewmembers searched multiple
times for a leak on Platform Elly but found nothing.

The company that provided the LDS to defendants (the "LDS
Provider") offered daily technical support to its clients, including
defendants.  The LDS Provider had a phone number (staffed 24 hours a
day) through which its clients could ask for help regarding LDS
alarms and how to respond, including for an additional fee after
regular business hours.  On October 1 and 2, 2021, defendants never
contacted the LDS Provider to ask for assistance regarding the eight
LDS alarms described below.

3

1        **D.   Defendants' Response to the Spill**

2        At approximately 4:10 p.m. on October 1, 2021, defendants' LDS

3   issued an alarm for the first time that day, indicating a potential

4   leak in the Pipeline.  In response to this alarm, defendants shut

5   down the Pipeline at approximately 5:10 p.m. on October 1, 2021.  At

6   approximately 5:40 p.m., defendants' crewmembers, due in part to

7   issues relating to the earlier upset, incorrectly assessed there was

8   no leak, and started pumping crude oil through the Pipeline again.

9        At approximately 5:52 p.m. on October 1, 2021, defendants' LDS

10  issued another alarm.  In response, at approximately 5:53 p.m. on

11  October 1, 2021, defendants shut down the Pipeline for the second

12  time that day.  At approximately 7:03 p.m. on October 1, 2021,

13  defendants' crewmembers, incorrectly assessing there was no leak,

14  started pumping crude oil through the Pipeline again.

15       At approximately 7:15 p.m. on October 1, 2021, defendants' LDS

16  issued another alarm.  In response, at approximately 7:42 p.m. on

17  October 1, 2021, defendants shut down the Pipeline for the third time

18  that day.  At approximately 8:29 p.m. on October 1, 2021, defendants'

19  crewmembers, incorrectly assessing there was no leak, started pumping

20  crude oil through the Pipeline again.

21       At approximately 8:39 p.m. on October 1, 2021, defendants' LDS

22  issued another alarm.  In response, at approximately 8:43 p.m. on

23  October 1, 2021, defendants shut down the Pipeline for the fourth

24  time that day.  At approximately 9:12 p.m. on October 1, 2021,

25  defendants' crewmembers, incorrectly assessing there was no leak,

26  started pumping crude oil through the Pipeline again.

27       At approximately 9:23 p.m. on October 1, 2021, defendants' LDS

28  issued another alarm.  In response, at approximately 9:24 p.m. on

October 1, 2021, defendants shut down the Pipeline for the fifth time that day.  At approximately 9:44 p.m. on October 1, 2021, defendants' crewmembers, incorrectly assessing there was no leak, started pumping crude oil through the Pipeline again.

At approximately 10:01 p.m. on October 1, 2021, defendants' LDS issued another alarm.  In response, at approximately 10:33 p.m. on October 1, 2021, defendants shut down the Pipeline for the sixth time that day.  At approximately 11:15 p.m. on October 1, 2021, defendants' crewmembers, incorrectly assessing there was no leak, started pumping crude oil through the Pipeline again.

At approximately 11:30 p.m. on October 1, 2021, defendants' LDS issued another alarm.  Defendants' crewmembers, incorrectly assessing there was no leak, continued pumping crude oil through the Pipeline until approximately 2:27 a.m. on October 2, 2021, when they shut it down for the seventh time.

The main reason why defendants' crewmembers continued pumping crude oil through the Pipeline from approximately 11:15 p.m. on October 1 to approximately 2:27 a.m. on October 2 was so that they could conduct a "manual leak detection test" to further investigate whether there was an actual leak.  In a manual leak detection test, crewmembers track flow meter data at each end of the Pipeline to monitor the quantities of crude oil being pumped into the Pipeline at Platform Elly and the quantities of oil arriving onshore at the end of the Pipeline, at specific intervals every thirty minutes, to determine if there is an imbalance suggesting a leak.  Defendants' crewmembers conducted a manual leak detection test, taking readings from flow meters at the respective ends of the Pipeline every thirty minutes from approximately 12:20 a.m. to 2:20 a.m. on October 2,

5

1   2021.  The flow meter readings taken at approximately 12:50 a.m. and

2   1:20 a.m. each revealed that approximately ten barrels more was being

3   pumped into the Pipeline at Platform Elly than was arriving onshore,

4   further indicating a potential leak.  Defendants' crewmembers

5   incorrectly believed that the ten-barrel difference was the result of

6   the higher quantity of produced water pumped into the Pipeline

7   earlier in the day.  By continuing to pump oil through the Pipeline

8   for approximately one hour after the crewmembers had received the

9   results of two consecutive flow meter readings that revealed a ten-

10  barrel difference and after the LDS already had issued seven alarms,

11  defendants negligently discharged oil in harmful quantities into San

12  Pedro Bay, in the contiguous zone of the United States, in violation

13  of 33 U.S.C. §§ 1321(b)(3), 1319(c)(1)(A).

14       At approximately 2:30 a.m. on October 2, 2021, after the manual

15  leak detection tests, defendants decided to request that a third

16  party conduct a "line ride," in which a boat travels above the course

17  of the underwater Pipeline, from shore to Platform Elly, in order to

18  determine if there is any indication of an oil spill or other

19  problems.  This was the first time defendants ever had requested a

20  line ride for the Pipeline in response to LDS alarms, and the first

21  time that defendants ever had requested a nighttime line ride for the

22  Pipeline.  The line ride was conducted from approximately 3:30 a.m.

23  to 4:30 a.m. on October 2, 2021, in the dark of night using

24  flashlights on a boat.  Defendants' personnel understood that it

25  would be difficult for a line ride to identify an oil spill in the

26  middle of the night by means of a flashlight.  The third party

27  conducting the line ride did not identify any sign of a leak during

28  the line ride and reported that to defendants' personnel.

1    As a result of defendants' continued erroneous belief that there
2    was no leak, defendants started pumping oil through the Pipeline at
3    approximately 5:11 a.m. on October 2, 2021.

4    At approximately 5:28 a.m. on October 2, 2021, defendants' LDS
5    issued another alarm.  Nonetheless, defendants did not shut the
6    Pipeline down for the eighth and final time until 6:04 a.m., when it
7    decided – according to its control-room logbook – to "wait for
8    daylight" (sunrise was at approximately 6:47 a.m. that day).  By
9    pumping crude oil through the Pipeline from approximately 5:11 a.m.
10   to 6:04 a.m. on October 2, 2021, defendants negligently discharged
11   oil in harmful quantities into San Pedro Bay, in the contiguous zone
12   of the United States, in violation of 33 U.S.C. §§ 1321(b)(3),
13   1319(c)(1)(A).

14   At approximately 7:00 a.m. on October 2, 2021, at defendants'
15   request, a third party began conducting a second line ride.  With the
16   benefit of daylight, the second line ride identified the spill at
17   approximately 8:00 a.m. and notified defendants.  Defendants
18   thereafter initiated their oil spill response plan, including, at
19   approximately 8:30 a.m., contacting their disaster response firm.

20       **E.    The Quantity of Discharged Oil**

21   The leak from the Pipeline, beginning at approximately 4:05 p.m.
22   October 1, 2021, and ending at approximately 6:04 a.m. on October 2,
23   2021, caused approximately 588 barrels of crude oil to spill into the
24   San Pedro Bay.  This was a quantity that was harmful to the public
25   health, welfare, and environment of the United States.

26       **F.    The Impact of the Spill**

27   The oil spill impacted to varying degrees a diverse group of
28   stakeholders, ranging, for example, from local surfers and

1   beachgoers, to recreational and commercial fishermen, to tourism
2   businesses, to individuals and businesses involved in the Great
3   Pacific Airshow that was scheduled for its final day on October 3,
4   2021 but was cancelled, to nonprofits involved in the clean-up of the
5   oil spill, as well as local, state, and federal governmental
6   agencies.  For example, after the spill, an area of approximately 650
7   square miles was closed to fishing, including approximately 45 miles
8   of shoreline.  Two days after the spill, Governor Newsom declared a
9   state of emergency due to the far-reaching impacts of the spill and
10  the related response efforts.

11      Defendants have paid the vast majority of expenses related to
12  the clean-up of the spill.  However, the Coast Guard has incurred
13  approximately $5,844,700 to date in direct and indirect expenses in
14  responding to the spill, including funds expended out of the Oil
15  Spill Liability Trust Fund administered by the Coast Guard.  On July
16  15, 2022, the Coast Guard submitted approximately $656,500 of those
17  expenses to defendants for payment, which invoice was paid on August
18  17, 2022.  Defendants intend to promptly pay any and all remaining
19  amounts once invoices are received from the Coast Guard.

20
21
22
23
24
25
26
27
28